1   BONNETT, FAIRBOURN, FRIEDMAN
      & BALINT, P.C.
2   ELAINE A. RYAN (*To be Admitted Pro Hac Vice*)
    PATRICIA N. SYVERSON (CA SBN 203111)
3   LINDSEY M. GOMEZ-GRAY (*To be Admitted Pro Hac Vice*)
    2325 E. Camelback Rd. Suite 300
4   Phoenix, AZ 85016
    eryan@bffb.com
5   psyverson@bffb.com
    lgomez-gray@bffb.com
6   Telephone: (602) 274-1100

7   BONNETT, FAIRBOURN, FRIEDMAN
    & BALINT, P.C.
8   Manfred P. Muecke (CA SBN 222893)
    600 W. Broadway, Suite 900
9   San Diego, California 92101
    mmuecke@bffb.com
10  Telephone: (619) 756-7748

11  STEWART M. WELTMAN, LLC
    Stewart M. Weltman (*To be Admitted Pro Hac Vice*)
12  53 W. Jackson Suite 364
    Chicago, IL 60604
13  sweltman@weltmanlawfirm.com
    Telephone: (312) 588-5033

14
    (Additional counsel appear on signature page)

15
    Attorneys for Plaintiff
16

17              **UNITED STATES DISTRICT COURT**

18              **SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 19  TOM BROWNE, an Individual, On Behalf of Himself and All Others 20  Similarly Situated, | Case No.:  **'14CV2687 GPC BLM** |
| 21                  Plaintiff, | **CLASS ACTION COMPLAINT FOR:** |
| 22             v. | 1.   VIOLATION OF THE UNFAIR COMPETITION LAW, Business and Professions Code §17200 *et seq.*; and |
| 23  THE COCA-COLA COMPANY, a Delaware Corporation, | 2.   VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT, Civil Code §1750 *et seq.* |
| 24             Defendant. | |
| 25 | DEMAND FOR JURY TRIAL |
| 26 | |

27

28

CLASS ACTION COMPLAINT

Plaintiff Tom Browne brings this action on behalf of himself and all others similarly situated against Defendant The Coca-Cola Company and states:

**NATURE OF ACTION**

1.      Defendant manufactures, markets, sells and distributes Minute Maid Pomegranate Blueberry 100% Fruit Juice Blend, a drink fortified with Life's algal DHA ("Minute Maid DHA" or "the Product").[1]  Through an extensive, widespread, comprehensive and uniform nationwide marketing campaign, Defendant promises that just 50 mg of algal DHA and four other nutrients (choline, Vitamin B12, Vitamin C and Vitamin E) support the brain.  On the front of each and every Minute Maid DHA label, where it cannot be missed by consumers, Defendant prominently states "Omega-3/DHA & 4 nutrients to Support Brain & Body[2]" (the "brain support representation").[3]  Defendant repeats the brain support representation on the back of the label and also represents that: "DHA is a key building block in the brain"; "Choline and B12 play a role in brain and nervous system signals"; "Antioxidant vitamin E may help shield the omega- 3s in the brain from free radicals"; and "Vitamin C is highly concentrated in brain nerve endings" (collectively, the "brain ingredients representations").   Thus, at or before the point of purchase, each and every consumer of Defendant's Minute Maid DHA is exposed (1) on the front of the label to the promise that consumption of the juice will "support" the brain, and (2) on the back of the label that DHA, choline, and vitamins B12, E and C provide the brain support benefit.  As set forth below, these representations, individually or taken as a whole, are either false and misleading or likely to deceive.

---

[1] Plaintiff reserves the right to include other Products upon completion of discovery.
[2] Plaintiff makes no allegations at this time regarding the truth or falsity of the support "body" representations as, on its face, it is an inscrutable statement that appears to be some sort of meaningless puffery as evidenced by the label only describing the purported benefits of DHA and the four other nutrients in the brain.
[3] Recently, Defendant changed the front label from "Omega-3/DHA Help Nourish Your Brain" and "5 nutrients to Support Brain" to "Omega-3/DHA & 4 nutrients to Support Brain."  Both of these representations are false, misleading and reasonably likely to deceive consumers.

2.     The best evidence to judge whether algal DHA provides any brain support benefits are randomized controlled trials ("RCTs").   Five RCTs involving the *same* algal DHA as is in the Product have found no causative link between DHA algal oil supplementation and brain support. The RCTs found that algal DHA does not support the brain even though they were funded by the manufacturer of the Life's DHA in the Product and used much higher doses of DHA than that found in the Product (at least eight times the amount of DHA in a single serving of the Product).

3.     In addition to not supporting the brain, the algal oil derived DHA in the Product is superfluous.  American children and adults, who are the target market for the Product, consume adequate amounts of DHA derived from dietary sources such as fish, soybean oil, canola oil, green leafy vegetables and flax seeds.  In fact, there is only one reported case of DHA deficiency in the United States in the last thirty or so years and it involved a girl on an intravenous diet.

4.     The Institute of Medicine ("IOM")—the health arm of the National Academies—has issued a report stating that it does not recognize a dietary requirement for DHA as there is no DHA deficiency in adults or children in the United States.   *See* Dietary Reference Intakes for Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids (Macronutrients): The National Academies Press; 2005 at 5-6, 11, 469.

5.     On April 22, 2014, the FDA embraced the IOM finding by publishing a Final Rule that acted on and expressly rejected Martek Biosciences Corp.'s (the maker of the Life's DHA in Defendant's Product) request that the FDA recognize a daily requirement for DHA.  *See*  http://www.gpo.gov/fdsys/pkg/FR-2014-04-28/pdf/2014-09492.pdf.  In doing so, the FDA acknowledged that there is no dietary requirement for DHA as it is not an essential nutrient.  *Id.*   That is why there is no daily value listed on the Product label.

6. Even if there were DHA deficient children and adults in the United States – which there are not – they would derive no brain support benefit from the Product because only a trivial amount of DHA in the Product enters the brain. The brain contains about 5000 mg of DHA, a serving of the Product would only replace about .000005% of the brain's DHA content in adults and children in the first day with less entering in each subsequent day. This amount is so trivial that it cannot and does not support the brain in any manner.

7. Thus, the overwhelming weight of scientific evidence is that DHA supplementation does not support the brain.

8. The other four ingredients in the Product also do not support the brain. Americans have sufficient amounts of choline and vitamins B12, C, and E in their diets such that supplementation will not provide any brain health benefits.

9. Thus, Defendant's brain support representation is false, misleading, and reasonably likely to deceive the public. And, the brain ingredient representations, while some may be technically true (e.g., DHA is a key building block in the brain), when read in context with the brain support representation made on the front of the label are false, misleading and reasonably likely to deceive the public because supplementation with these ingredients does not support brain health.

10. The FTC agrees and has cautioned the supplement industry that "if an ad would be misleading without certain qualifying information, that information must be disclosed. For example, advertisers should disclose information relevant to the limited application of an advertised benefit." FTC, Dietary Supplements: An Advertising Guide for Industry at 5.

11. Defendant has employed numerous methods to convey its uniform, deceptive representations to consumers including the front of the Product's packaging and labeling where it cannot be missed by consumers.

12.    As a result of Defendant's deceptive representations, consumers—including Plaintiff and members of the proposed Class—have purchased a Product which does not perform as advertised.  Plaintiff and Class members paid a price premium for Minute Maid DHA over Defendant's other Minute Maid juices that do not claim to support the brain.

13.    Plaintiff brings this action on behalf of himself and other similarly situated consumers who have purchased Minute Maid DHA to halt the dissemination of this false, misleading and deceptive advertising message, correct the false and misleading perception it has created in the minds of consumers, and obtain redress for those who have purchased the Product.  Based on violations of state unfair competition laws (detailed below), Plaintiff seeks individual injunctive relief and monetary relief for similarly situated consumers who purchased the Product.

## JURISDICTION AND VENUE

14.    This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members and many members of the Class are citizens of a state different from Defendant.

15.    This Court has personal jurisdiction over Defendant because Defendant is authorized to conduct and does business in California.  Defendant has marketed, promoted, distributed, and sold Minute Maid DHA in California and Defendant has sufficient minimum contacts with this State and/or sufficiently avails itself of the markets in this State through its promotion, sales, distribution and marketing within this State to render the exercise of jurisdiction by this Court permissible.

16.    Venue is proper in this Court pursuant to 28 U.S.C. §§1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred while he resided in this judicial district.  Venue is also proper under 18 U.S.C. §1965(a) because Defendant transacts substantial business in this District.

**PARTIES**

17.    Plaintiff Tom Browne resides in San Diego, California and is California resident.  Between 2011 and 2014, Plaintiff purchased several bottles of Minute Maid DHA from a variety of third-party retailers including Albertsons, Ralphs and Vons in San Diego, California.  Prior to purchasing the Products, Plaintiff was exposed to and saw Defendant's brain support and brain ingredient representations by reading the Product labels.  Plaintiff purchased the Products in reliance on Defendant's brain support and brain ingredient representations. He paid approximately $3.50 for each of the Products.   The Products Plaintiff purchased do not support the brain as represented.  As a result, Plaintiff suffered injury in fact and lost money. Had Plaintiff known the truth about Defendant's misrepresentations, he would not have purchased the Products.

18.    Defendant Coca-Cola Company is a Delaware corporation with its principal place of business in Atlanta Georgia.  Coca-Cola is the world's leading owner and marketer of nonalcoholic beverages.  Coca-Cola manufactures, advertises, markets, distributes and sells Minute Maid DHA throughout the United States, including California.

**FACTUAL ALLEGATIONS**

*Minute Maid DHA*

19.    Since at least September 2007, Defendant has manufactured, distributed, marketed and sold the Product throughout the United States, including California.  The Product is sold in virtually every major food, drug, and mass retail outlet in the country, and retails between approximately $2.99 to $4.99.

20.    Since the Product's launch, Defendant has consistently conveyed the message to consumers throughout the United States, including California, that the Omega-3 DHA and the four other nutrients in the Product "Support" the "brain" and that "DHA is a key building block in the brain"; "Choline and B12 play a role in

brain and nervous system signals"; "Antioxidant vitamin E may help shield the omega- 3s in the brain from free radicals"; and "Vitamin C is highly concentrated in brain nerve endings".  Defendant's brain support representation is false, misleading and likely to deceive and Defendant's brain ingredient representations, when read in conjunction with the brain support representation, are deceptive.

21.    Each and every consumer who purchases the Product is exposed to Defendant's deceptive brain support representation, which appears prominently and conspicuously on the front of the Product's packaging as follows:



The prior label, used during most of the class period is attached as Exhibit A.

22.    On the bottom left corner of the back label on the Minute Maid DHA bottle, Defendant repeats the brain support representation, and when read in the context of the brain support representation on both the front and back of the label, at a minimum, misleadingly and deceptively imparts the message that additional

ingredients help support the brain, when they do not:




23.    These representations, taken as a whole, provide consumers with a deceptive impression that they are purchasing a product with a meaningful brain support benefit.  As described below, however, Defendant's representations are either false and misleading or likely to deceive.

***Minute Maid DHA Does Not Support the Brain***

24.    Defendant represents that the claimed brain support benefit is achieved from 5 ingredients in the Product.

25.    The first ingredient is DHA algal oil.  DHA is a long-chain omega-3 fatty acid typically found in cold water fish.  The DHA in Defendant's Product is not derived from fish.  Instead, the Life's DHA in the Product -- manufactured by Martek Biosciences -- is an immature short-chain omega-3 fatty acid made from an extract of mutated and fermented algae.  Contrary to Defendant's representations made on each and every Product package, DHA algal oil does not support the brain.

26.     Several RCTs, regarded by experts in the field as the "gold standard" of scientific evidence, and the only credible means of proving whether a substance has an effect in humans, have found no brain function benefits from consumption of supplemental DHA even in much higher dosages than in a serving of the Product.

27.     For example, a 2008 RCT funded by Martek Biosciences, the manufacturer of the Life's DHA in the Product, examined algal DHA supplementation (400 mg compared to 50 mg in one serving of the Product) in 4-year old children for 16 weeks and reported no effect of DHA on 4 measures of cognitive function in children. *See* Ryan, A., et al., Assessing The Effect Of Docosahexaemoic Acid On Cognitive Functions In Healthy Preschool Children, 47(4) Clin. Pediatr. 355-62 (2008).

28.     In a 2008 RCT, Johnson and colleagues divided the subjects into 4 groups. Over 20 memory and processing tests were conducted and scored after 16 weeks of DHA supplementation at 800 mg per day. DHA was found to be beneficial in 1 test on verbal fluency and no better than placebo on over 20 others. Because the authors defined statistical significance as $p<0.05$, by chance alone 1 out of 20 measures was expected to be statistically different. Thus, because Johnson made 25 measures with the DHA group, the 1 positive finding is due to chance and the 24 comparisons that were no better than placebo show that 800mg per day of DHA does not provide brain health benefits.  *See* Johnson EJ, et. al., Cognitive Findings Of An Exploratory Trial Of Docosahexaenoic Acid And Lutein Supplementation In Older Women, 11 Nutr. Neurosci.  75-8 (2008).

29.     In a 2009 RCT, David Kennedy and colleagues examined the effects of 400 or 1000 mg of DHA per day compared to placebo on a battery of cognitive tests in children ages 10 to 12.  *See* Kennedy, DO, et al., Cognitive And Mood Effects Of 8 Weeks' Supplementation With 400 Mg Or 1000 Mg Of The Omega-3 Essential Fatty Acid Docosahexaenoic Acid (DHA) In Healthy Children Aged 10–12 Years,

12 Nutr. Neurosci. 48-56 (2009).  At a dose of 400 mg per day, scores on 1 of 35 measures improved while 1 score out of 35 was worse upon 1000 mg per day, and no effect was observed on 68 other measures.  *Id*. Because so many tests were conducted, both the one positive and the one negative finding are due to chance but the 33 that showed no effect by their sheer weight are not due to chance and demonstrate a lack of efficacy.  *Id.*  In fact, the authors conclude: "The results here do not suggest that supplementation with these doses of DHA for 8 weeks has any beneficial effect on brain function in cognitively intact children." *Id.*

30.    Similarly, a RCT reported by McNamara, RK, et al., Docosahexaenoic Acid Supplementation Increases Prefrontal Cortex Activation During Sustained Attention In Healthy Boys; A Placebo-Controlled, Dose-Ranging, Functional Magnetic Resonance Imaging Study, 91 Am. J. Clin. Nutr., 1060-7 (2010), examined the effect of 400 or 1200 mg DHA per day compared to placebo on attention scores in healthy boys. For the 4 endpoints that were registered with clinicaltrial.gov,[4] McNamara and colleagues reported no effects of DHA on all 4 measures.

31.    Finally, in a 2012 RCT, Alexandra Richardson and colleagues examined placebo or 600 mg of DHA per day for 16 weeks in school children ages 7 to 9 who were under the 33rd percentile in reading scores.  *See* Richardson, AJ, et al., Docosahexaenoic Acid For Reading, Cognition And Behavior In Children Aged 7–9 Years: A Randomized, Controlled Trial (The DOLAB Study), PLoS One, 7:e43909 (2012).   To the extent that Richardson and colleagues represents the general population, at the end of the study, Richardson and colleagues reports no differences between DHA and placebo on reading scores, reading age, two working memory scores or 14 behaviour scores whether rated by parents, teachers or using intent-to-treat (all subjects) or per protocol design (only those who completed the study). *Id*.

---

[4] Every clinical trial is required to register its study with clinicaltrial.gov, setting forth, among other things, the endpoints that the study is designed to examine.  Under universally accepted scientific protocols, conclusions can only be drawn from the results of the registered endpoints.

Thus, this study showed no efficacy.

32.     All of the RCTs using the DHA in the Product showed no benefit on the primary registered endpoints—the only endpoints from which cause and effect conclusions can be drawn.   Each of the studies had adequate sample sizes, were typical of the size commonly used in and relied upon in the scientific community and were adequate to test the hypotheses presented in each study.   Additionally, the RCTs used much higher doses of DHA than that found in the Product – at least eight times the amount of DHA in one serving of the juice – making it even more likely that a positive result would be found, yet there were none that could not be attributed to chance alone.

33.     These scientific studies establish that there is no cause and effect relationship between intake of DHA dietary supplements like the DHA in Defendant's Product and cognitive development.   Defendant's representations are false and misleading and reasonably likely to deceive the consumer.

34.     Furthermore, American children and adults get sufficient DHA in their daily diet.   Molecular DHA does play a role in the brain.   But, this does not mean supplemental DHA supports brain function.   Much as the brain needs oxygen to function, humans do not need to supplement their diets with foods containing oxygen; nor do humans need DHA supplementation.   In fact, there is only one reported case of DHA deficiency in the United States in the last thirty or so years and it involved a girl on an intravenous diet.

35.     The IOM—the health arm of the National Academies—has issued a report stating that it does not recognize a dietary requirement for DHA as there is no DHA deficiency in adults or children in the United States.   *See* Dietary Reference Intakes for Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids (Macronutrients): The National Academies Press; 2005 at 5-6, 11, 469. Specifically, the IOM concluded that Americans consume sufficient amounts of

alpha-linolenic acid (ALA), a dietary precursor to DHA, in their daily diet by eating fish, soybean oil, canola oil, green leafy vegetables and flax seeds among other vegetables.  ALA is converted to DHA by a series of enzymes, largely in the liver.  Thus, the algal oil derived DHA in the Product has no effect on brain function as it is not an essential nutrient and American adults and children are already consuming adequate amounts of its precursor ALA.

36.     And, on April 22, 2014, the FDA, citing the 2005 IOM report, published a Final Rule that acted on and expressly rejected Martek Biosciences Corp.'s (the maker of the DHA in Coca Cola's Product) request that the FDA recognize a daily requirement for DHA.[5]   79 Fed. Reg. 23262 available at http://www.gpo.gov/fdsys/pkg/FR-2014-04-28/pdf/2014-09492.pdf.   In doing so, the FDA acknowledged that there is no dietary requirement for DHA as it is not an essential nutrient. *Id.* The FDA's ruling applies to the entire U.S. population, including adults and children ages 2 years and older – Defendant's target market for the Product.

37.     Even if the algal oil derived DHA was not superfluous, such a trivial amount of the DHA in a serving of the Product enters the brain that it is incapable of providing any brain function benefit.  Based on the amount of DHA available to the brain in the plasma pool and the amount of DHA the brain uptakes from this plasma pool, approximately 0.0005% of an oral dosage of 50 mg of DHA enters the brain in 24 hours with much less entering in each subsequent day.  And, because the brain contains about 5000 mg of DHA, a serving of the Product would only replace about .000005% of the brain's DHA content in the first day.  Even at the highest point in the range of DHA in the Product, this amount of DHA is trivial and does not contribute to brain function.  Indeed, RCTs have found that DHA in much higher

---

[5] The Martek notification proposed the following exact wording for these claims: "'Excellent source of DHA.' ('High in DHA,' 'Rich in DHA') contains ____ mg of DHA per serving, which is ____ % of the 160 mg daily value for DHA." 79 Fed. Reg. at 23263 n.3.

1   dosages does not provide brain health benefits.

2       38.     Thus, the overwhelming weight of scientific evidence is that DHA

3   supplementation does not support the brain for consumers.

4       39.     In addition to DHA, the Minute Maid DHA product contains four other

5   vitamin supplements that Defendant represents provide brain health benefits or

6   support the brain:   Choline, Vitamin B12, Vitamin C and Vitamin E.   These

7   supplements do not provide any brain health benefits as opposed to their natural

8   counterparts which are already present in a consumer's diet.

9       40.     Defendant represents that choline and vitamin B12 "play a role in brain

10  and nervous system signals."   While this statement may be technically true as it

11  regards their natural counterparts found in food, supplementation is unnecessary and

12  superfluous when it comes to brain health. Americans get sufficient amounts of

13  choline for brain health in their diet from eating, for example, eggs, meat and milk.  In

14  this regard, the IOM confirms that there is no choline deficiency in the American

15  population.   Like choline, there is no vitamin B12 deficiency in the American

16  population.   Thus, the choline and vitamin B12 supplements in the Product have no

17  effect on the brain as American adults and children are already consuming adequate

18  amounts of choline and vitamin B12.

19      41.     Defendant represents that the vitamin C in the product "is highly

20  concentrated in brain nerve endings".   Again, while this may be technically true,

21  when read in context, it is, at a minimum, misleading and deceptive because the

22  vitamin C supplement in the Product is unnecessary and superfluous when it comes

23  to brain health.   With respect to brain health, there is no vitamin C deficiency in the

24  American population. Thus, the vitamin C in the Product provides no brain health

25  benefits as American adults and children are already consuming adequate amounts

26  of vitamin C.

27

28

42. Defendant represents that the vitamin E in the Product is an "Antioxidant" that "may help shield the omega- 3s in the brain from free radicals". This statement is either, at a minimum, misleading and deceptive when read in context or means nothing – since it contains its own qualifier "may". Whether antioxidants shield DHA from free radicals is a hypothetical theory based upon in vitro studies that do not permit any conclusions to be drawn about how they may or may not work in the human body. Further, there is no vitamin E deficiency in the American population. Thus, the vitamin E in the Product provides no brain health benefits as American adults and children are already consuming adequate amounts of vitamin E.

***The Impact of Defendant's Wrongful Conduct***

43. Defendant continues to make the brain support and brain ingredient representations when none of the five ingredients in the Product provide brain support benefits such that these representations are, at minimum, likely to deceive.

44. Plaintiff and Class members have been and will continue to be deceived or misled by Defendant's deceptive brain support and brain ingredient representations. Plaintiff purchased the Product during the relevant time period and in doing so, read and considered the Product labels and based his decision to buy the Products on the brain support and brain ingredient representations. Defendant's brain support and brain ingredient representations were a material factor in influencing Plaintiff's decision to purchase the Products. Plaintiff would not have purchased the Products had he known that Defendant's brain support representation was false and misleading and that the brain ingredient representations, when read in conjunction with the brain support representation, were deceptive.

45. As a result, Plaintiff and the Class members have been damaged in their purchases of the Product and have been deceived into purchasing a Product that they believed, based on Defendant's representations, supports the brain, when, in fact, it

does not.

46.   Based upon the purported brain support and brain ingredient representations conveyed in its marketing and advertising campaign, Defendant is able to price Minute Maid DHA at a premium over Defendant's other Minute Maid Juices that do not make the deceptive brain support representations.

47.   Defendant has reaped enormous profits from its false marketing and sale of the Product.

## CLASS DEFINITION AND ALLEGATIONS

48.   Plaintiff brings this action on behalf of himself and all other similarly situated consumers pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class against Defendant for violations of California state laws and/or similar laws in other states:

**Multi-State Class Action**
All consumers who, within the applicable statute of limitations, purchased Minute Maid DHA in California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington until the date notice is disseminated.

Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased Minute Maid DHA for the purpose of resale.

49.   Alternatively, Plaintiff brings this action on behalf of himself and all other similarly situated California consumers pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class:

**California-Only Class Action**
All California consumers, within the applicable statute of limitations, who purchased Minute Maid DHA until the date notice is disseminated.

Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased Minute Maid DHA for the purpose of resale.

50.     In addition, Plaintiff seeks individual injunctive relief prohibiting Defendant in California from continuing to make the brain support and brain ingredient representations and corrective advertising.

51.     ***Numerosity***.  The members of the Class are so numerous that joinder of all members of the Class is impracticable.  Plaintiff is informed and believes that the proposed Class contains thousands of purchasers of Minute Maid DHA who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiff.

52.     ***Existence and Predominance of Common Questions of Law and Fact***. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members.   These common legal and factual questions include, but are not limited to, the following:

  (a)  whether the claims discussed above, individually or taken as a whole, are true, or are misleading, or objectively reasonably likely to deceive;

  (b)  whether Defendant's alleged conduct violates public policy;

  (c)  whether the alleged conduct constitutes violations of the laws asserted; and

  (d)  whether Defendant engaged in false or misleading advertising.

53.     ***Typicality***.  Plaintiff's claims are typical of the claims of the members of the Class because, *inter alia*, all Class members were injured through the uniform misconduct described above and were subject to Defendant's brain support and brain ingredient representations that accompanied each and every bottle of Minute Maid DHA.  Plaintiff is advancing the same claims and legal theories on behalf of himself and all members of the Class.

54.     ***Adequacy of Representation***.   Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained counsel

1  experienced in complex consumer class action litigation, and Plaintiff intends to
2  prosecute this action vigorously.  Plaintiff has no adverse or antagonistic interests to
3  those of the Class.

4       55.  ***Superiority***.  A class action is superior to all other available means for
5  the fair and efficient adjudication of this controversy.  The damages or other financial
6  detriment suffered by individual Class members is relatively small compared to the
7  burden and expense that would be entailed by individual litigation of their claims
8  against Defendant.  It would thus be virtually impossible for Plaintiff and Class
9  members, on an individual basis, to obtain effective redress for the wrongs done to
10  them.  Furthermore, even if Class members could afford such individualized
11  litigation, the court system could not.  Individualized litigation would create the
12  danger of inconsistent or contradictory judgments arising from the same set of facts.
13  Individualized litigation would also increase the delay and expense to all parties and
14  the court system from the issues raised by this action.  By contrast, the class action
15  device provides the benefits of adjudication of these issues in a single proceeding,
16  economies of scale, and comprehensive supervision by a single court, and presents
17  no unusual management difficulties under the circumstances here.

18  
19  

**COUNT I**
**Violation of Business & Professions Code §17200, *et seq*.**

20       56.  Plaintiff repeats and re-alleges the allegations contained in the
21  paragraphs above, as if fully set forth herein.

22       57.  Plaintiff brings this claim individually and on behalf of the Class.

23       58.  As alleged herein, Plaintiff has suffered injury in fact and lost money or
24  property as a result of Defendant's conduct because he purchased Minute Maid DHA
25  in reliance on Defendant's claim that the Product would support the brain, but did
26  not receive a Product that supports the brain.

27       59.  The Unfair Competition Law, Business & Professions Code §17200, *et*

28

*seq.* ("UCL"), prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising. Similar statutes, identical in their material respects, are in effect in all states that are a part of the alleged Multi–State Class.

60.    In the course of conducting business, Defendant committed unlawful business practices by, *inter alia*, making the brain support and brain ingredient representations (which also constitutes advertising within the meaning of §17200), as set forth more fully herein, and violating Civil Code §§1572, 1573, 1709, 1711, 1770(a)(5), (7), (9) and (16) and Business & Professions Code §§17200, et seq., 17500, et seq., and the common law. Plaintiff and the Class reserve the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

61.    In the course of conducting business, Defendant committed "unfair" business practices by, *inter alia*, making the brain support and brain ingredient representations (which also constitutes advertising within the meaning of §17200) regarding the Minute Maid DHA in its advertising campaign, including the Product's packaging, as set forth more fully herein. There is no societal benefit from false advertising, only harm. Plaintiff and other Class members paid for a Product that supports the brain, which they did not receive. While Plaintiff and Class members were harmed, Defendant was unjustly enriched by its false representations. Because the utility of Defendant's conduct (zero) is outweighed by the gravity of the harm Plaintiff and Class members suffered, Defendant's conduct is "unfair" having offended an established public policy. Further, Defendant engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

62.    Further, as stated in this Complaint, Plaintiff alleges violations of consumer protection, unfair competition and truth–in–advertising laws resulting in

harm to consumers. Defendant's acts also violate and offend the public policy against engaging in false and misleading advertising, unfair competition and deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong of Business & Professions Code §17200, et seq.

63.    There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

64.    Business & Professions Code §17200, et seq., also prohibits any "fraudulent business act or practice."

65.    In the course of conducting business, Defendant committed "fraudulent business act or practices" by, *inter alia*, making the brain support and brain ingredient representations (which also constitutes advertising within the meaning of §17200) regarding the Minute Maid DHA in its advertising campaign, including the Product's packaging, as set forth more fully herein.

66.    Defendant misrepresented on each and every Product package that the Omega-3 DHA and the four other nutrients in the Product "Support" the "brain" and that "DHA is a key building block in the brain"; "Choline and B12 play a role in brain and nervous system signals"; "Antioxidant vitamin E may help shield the omega-3s in the brain from free radicals"; and "Vitamin C is highly concentrated in brain nerve endings" when, in fact, none of the five ingredients in the Product provide brain support benefits.

67.    Defendant's actions, claims and misleading statements, as more fully set forth above, were also false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code §17200, et seq.

68.    Plaintiff and other members of the Class have in fact been deceived as a result of their reliance on Defendant's material representations, which are described above. This reliance has caused harm to Plaintiff and other members of the Class who each purchased Defendant's Minute Maid DHA.   Plaintiff and the other Class

members have suffered injury in fact and lost money as a result of these unlawful, unfair, and fraudulent practices.

69.     As a result of its deception, Defendant has been able to reap unjust revenue and profit.

70.     Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate

71.     Plaintiff, on behalf of himself, all others similarly situated, and the general public, seeks restitution of all money obtained from Plaintiff and the members of the Class collected as a result of unfair competition, and acting individually he seeks an injunction prohibiting Defendant from continuing such practices, corrective advertising in California and all other relief this Court deems appropriate, consistent with Business & Professions Code §17203.

### COUNT II
### Violations of the Consumers Legal Remedies Act –
### Civil Code §1750 *et seq.*

72.     Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

73.     Plaintiff brings this claim individually and on behalf of the Class.

74.     This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §1750, *et seq.* (the "Act"). Similar statutes, identical in their material respects, are in effect in all states that are a part of the alleged Multi–State Class.

75.     Plaintiff is a consumer as defined by California Civil Code §1761(d). Defendant's Minute Maid DHA is a "good" within the meaning of the Act.

76.     Defendant  violated and continue to violate the Act by engaging in the following practices proscribed by California Civil Code §1770(a) in transactions with Plaintiff and the Class which were intended to result in, and did result in, the sale of Minute Maid DHA:

(5)    Representing that [Minute Maid DHA has] . . . approval, characteristics, . . . uses [and] benefits . . . which [it does] not have . . . .

\*    \*    \*

(7)    Representing that [Minute Maid DHA is] of a particular standard, quality or grade . . . if [it is] of another.

\*    \*    \*

(9)    Advertising goods . . . with intent not to sell them as advertised.

\*    \*    \*

(16)    Representing that [Minute Maid DHA has] been supplied in accordance with a previous representation when [it has] not.

77.    Defendant violated the Act by misrepresenting material facts on the Minute Maid DHA labeling and packaging and associated advertising, as described above, when the representations were false and misleading.

78.    Pursuant to California Civil Code §1782(d), Plaintiff and the Class seek a Court order enjoining the above-described wrongful acts and practices of Defendant and for restitution and disgorgement.

79.    Pursuant to §1782 of the Act, Plaintiff notified Defendant in writing by certified mail of the particular violations of §1770 of the Act and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act.  A copy of the letter is attached hereto as Exhibit B.

80.    If Defendant fails to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to §1782 of the Act, Plaintiff will amend this Complaint to add claims for actual, punitive and statutory damages, as appropriate.

81.    Defendant's conduct is fraudulent, wanton and malicious.

82. Pursuant to §1780(d) of the Act, attached hereto as Exhibit C is the affidavit showing that this action has been commenced in the proper forum.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for a judgment:

A. Certifying the Class as requested herein;

B. Awarding restitution and disgorgement of Defendant's revenues to Plaintiff and the proposed Class members;

C. Awarding injunctive relief as permitted by law or equity, including: enjoining Defendant in California from continuing the unlawful practices as set forth herein;

D. Ordering Defendant to engage in a corrective advertising campaign;

E. Awarding attorneys' fees and costs; and

F. Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial of his claims by jury to the extent authorized by law.

Dated: November 12, 2014     BONNETT, FAIRBOURN, FRIEDMAN
     & BALINT, P.C.

     s/Patricia N. Syverson
     ELAINE A. RYAN (*To be Admitted Pro Hac Vice*)
     PATRICIA N. SYVERSON (CA SBN 203111)
     LINDSEY M. GOMEZ-GRAY (*To be Admitted Pro Hac Vice*)
     2325 E. Camelback Rd. Suite 300
     Phoenix, AZ 85016
     eryan@bffb.com
     psyverson@bffb.com
     lgomez-gray@bffb.com
     Telephone: (602) 274-1100

     BONNETT, FAIRBOURN, FRIEDMAN
     & BALINT, P.C.
     Manfred P. Muecke (CA SBN 222893)
     600 W. Broadway, Suite 900
     San Diego, California 92101

mmuecke@bffb.com
Telephone:  (619) 756-7748

STEWART M. WELTMAN, LLC
Stewart M. Weltman (*To be Admitted Pro Hac Vice*)
53 W. Jackson Suite 364
Chicago, IL 60604
sweltman@weltmanlawfirm.com
Telephone:  (312) 588-5033

HARKE CLASBY & BUSHMAN LLP
Lance A. Harke, P.A. (*To be Admitted Pro Hac Vice*)
Howard M. Bushman, P.A. (*To be Admitted Pro Hac Vice*)
9699 NE Second Avenue
Miami Shores, Florida 33138
lharke@harkeclasby.com
hbushman@harkeclasby.com
Telephone: (305) 536-8220
Facsimile: (305) 536-8229

*Attorneys for Plaintiff*